RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0183p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CLAUDE BERNARD ROBINSON and JULIA D. ROBINSON, infant, by Melvin Robinson, their father and next friend, et al.,
*Plaintiffs-Appellees,*

UNITED STATES OF AMERICA,
*Plaintiff-Intervenor-Appellee/ Cross-Appellant,*

*v.*

SHELBY COUNTY BOARD OF EDUCATION,
*Defendant-Appellant/Cross-Appellee.*

Nos. 07-6076/6363

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 63-04916—Bernice B. Donald, District Judge.

Argued: July 25, 2008

Decided and Filed: May 21, 2009

Before: COOK and GRIFFIN, Circuit Judges; MARBLEY, District Judge.[*]

---

## COUNSEL

**ARGUED:** Valerie Barnes Speakman, SHELBY COUNTY SCHOOLS, Memphis, Tennessee, for Appellant. April J. Anderson, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Valerie Barnes Speakman, SHELBY COUNTY SCHOOLS, Memphis, Tennessee, for Appellant. April J. Anderson, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

GRIFFIN, J., delivered the opinion of the court, in which COOK, J., joined. MARBLEY, D. J. (pp. 19-42), delivered a separate dissenting opinion.

---

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

1

Nos. 07-6076/6363     *Robinson, et al. v. Shelby County Bd. of Educ.*     Page 2

---

## OPINION

---

GRIFFIN, Circuit Judge.  This appeal presents the final chapter in the court-ordered desegregation of the Shelby County, Tennessee, public school system, a process which began forty-five years ago.  In 1963, plaintiff public school students[1] filed this class action against defendant Shelby County Board of Education ("Board") alleging unconstitutional racial segregation in the Shelby County schools.  In the ensuing period, the district court issued numerous orders requiring the elimination of all vestiges of state-imposed public school segregation in accordance with the mandate of *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483 (1954).  A court-approved desegregation plan was implemented and in August 2006, after decades of court supervision, the parties moved jointly to dissolve all outstanding orders, declare the school district a unitary school system, and terminate the litigation.  The United States, which has participated as an intervenor since 1966, supported the motion.[2]

Despite the parties' universal agreement that the goals of the desegregation plan have been satisfactorily fulfilled and that educational parity has been attained, the district court disagreed that the constitutional requirements for unitary status have been met in all relevant respects.  Consequently, although the court granted the joint motion in regard to facilities, transportation, and staffing, it denied the motion as it pertained to the areas of student assignment, faculty integration, and extracurricular activities.  The district court established new "racial ratios" for the racial composition of students and faculty

---

[1] At oral argument, counsel asserted that throughout this litigation plaintiffs have been represented by the NAACP Legal Defense and Education Fund.

[2] In its response to the joint motion, the United States advised the district court that "[t]he United States has not received any complaints concerning the district's compliance with its desegregation obligations."  Further, after the conclusion of two "fairness hearings," *see generally UAW v. Gen. Motors Corp.*, 497 F.3d 615, 635 (6th Cir. 2007), the United States represented:  "It would appear on whole that the defendant has complied in good faith with the deseg[regation] orders and . . . under applicable legal principles they are entitled to a dismissal."

Nos. 07-6076/6363    *Robinson, et al. v. Shelby County Bd. of Educ.*    Page 3

which it expected to be met no later than October 2012. The court anticipated that if its new orders were followed, it would end its school supervision by October 2015.[3]

Defendant Shelby County Schools now appeals the portion of the district court order denying the joint motion for unitary status. The intervenor United States appeals the remedy ordered by the district court for faculty integration.[4]

For the reasons stated below, we hold that the district court abused its discretion by denying the parties' joint motion for unitary status regarding student assignment, faculty integration, and extracurricular activities. Accordingly, we reverse, in part, the order of the district court and remand with instructions to grant in full the parties' joint motion for declaration of unitary status, dissolve all outstanding orders and injunctions as to the Board and its members, and dismiss this action as to all parties and claims.

I.

In general, "'[t]he acceptance of a settlement in a class action suit is discretionary with the court and will be overturned only by a showing of abuse of discretion.'" *Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of Am., AFL-CIO*, 803 F.2d 878, 880 (6th Cir. 1986) (quoting *Laskey v. UAW*, 638 F.2d 954, 957 (6th Cir. 1981)). *See also Fidel v. Farley*, 534 F.3d 508, 513 (6th Cir. 2008) ("We review a district court's approval of a settlement as fair, adequate, and reasonable for abuse of discretion.") (citation omitted).

In the specific setting of a school desegregation class action, "[w]here the relief sought in the district court is the dissolution of a[] [desegregation decree], the order of the district court is subject to a mixed standard of review." *Manning ex rel. Manning v. School Bd. of Hillsborough County*, 244 F.3d 927, 940 (11th Cir. 2001). We review the district court's partial denial of the parties' joint motion to dissolve the desegregation decree for an abuse of discretion. *Id.* (citation omitted); *see also Little Rock Sch. Dist.*

---

[3] On April 24, 2008, a different panel of this court granted defendant's motion to stay the order of the district court pending our resolution of the merits of this appeal.

[4] Plaintiffs moved unsuccessfully to file a late brief in support of the Board's appeal.

Nos. 07-6076/6363       *Robinson, et al. v. Shelby County Bd. of Educ.*       Page 4

*v. Pulaski County Special Sch. Dist. No. 1*, 921 F.2d 1371, 1391 (8th Cir. 1990) (reviewing district court's rejection of settlement plan in school desegregation case for abuse of discretion); *Armstrong v. Bd. of School Directors of City of Milwaukee*, 616 F.2d 305, 319 (7th Cir. 1980), overruled in part on other grounds by *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998) (holding that the abuse of discretion standard "is not reserved only for purely economic [class action] litigation" and thus "will govern our review of the district court's approval of the [desegregation] settlement proposal.").

The district court's application of the law is subject to de novo review, while the court's factual findings, including its determination that a school district has not achieved unitary status, fall under the clearly erroneous standard of Federal Rule of Civil Procedure 52(a). *Manning*, 244 F.3d at 940 (citations omitted); *Holton v. City of Thomasville School Dist.*, 425 F.3d 1325, 1336 (11th Cir. 2005) (citations omitted). "Courts of appeals view the facts in the light most favorable to the settlement." *Armstrong*, 616 F.2d at 315 (citation omitted).

II.

The procedural history of this class action, which is set forth in detail in the district court's order addressing the parties' joint motion for a declaration of unitary status, reflects four decades of slow but steady progress in the removal of all vestiges of state-imposed public school segregation. The present-day posture of the case finds the parties at a new crossroads – facing the rare and atypical situation in which a district court has rejected, in part, a reasonable and good-faith joint motion by plaintiffs and defendant to declare a school system unitary. *See* Wendy Parker, *The Decline of Judicial Decisionmaking: School Desegregation and District Court Judges*, 81 N.C. L. REV. 1623, 1636-37 nn.76-80 (2003) (symposium) (collecting cases in which joint motions for unitary status were approved).

In applying the abuse-of-discretion review standard to these uncommon circumstances, we acknowledge as a preliminary matter that a district court's "familiarity with the litigants and the litigation [in a long-standing desegregation suit] is a valuable asset which should not lightly be discarded." *Armstrong*, 616 F.2d at 319.

Nos. 07-6076/6363      *Robinson, et al. v. Shelby County Bd. of Educ.*      Page 5

Nonetheless, it is also well-established that "[p]ublic policy strongly favors settlement of disputes without litigation . . . . Settlement agreements should therefore be upheld whenever equitable and policy considerations so permit." *Ford Motor Co. v. Mustangs Unlimited, Inc.*, 487 F.3d 465, 469 (6th Cir. 2007) (quoting *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1976)). *See also Gen. Motors Corp.*, 497 F.3d at 632 (noting "the federal policy favoring settlement of class actions") (citation omitted). This policy applies equally to desegregation cases. *See Little Rock Sch. Dist.*, 921 F.2d at 1388 (noting that "[a] strong public policy favors agreements, and courts should approach them with a presumption in their favor" in ordering the district court to approve a desegregation settlement plan.).

The voluntary settlement of school desegregation controversies is to be encouraged, even though such litigation implicates the important civil rights of the plaintiff class:

> [D]espite the importance of the substantive rights of the class members, settlement is an appropriate method of arriving at a school desegregation remedy. While courts should be extremely sensitive to the possibilities for abuse where a compromise of the civil rights of a class is proposed, a blanket prohibition of compromise could result, in many cases, in abandonment of the substantial benefits which can result from voluntary resolution of litigation, without a commensurate increase in the protection accorded the civil rights of the class. Indeed, it appears that school desegregation is one of the areas in which voluntary resolution is preferable to full litigation because the spirit of cooperation inherent in good faith settlement is essential to the true long-range success of any desegregation remedy. A remedial decree reached through agreement between the parties may, because of the community cooperation it inspires, more effectively implement the constitutional guarantee of equal protection than a seemingly more stringent court-ordered remedy which the community views as imposed upon it from the outside.

*Armstrong*, 616 F.2d at 317-18 (internal citations omitted).

In *Armstrong*, the Seventh Circuit Court of Appeals applied the abuse-of-discretion standard in affirming the district court's approval of a settlement agreement terminating a public school desegregation class action. We find its extensive analysis to be instructive. The *Armstrong* court held correctly that even "a school desegregation

Nos. 07-6076/6363    *Robinson, et al. v. Shelby County Bd. of Educ.*    Page 6

plan devised through voluntary means . . . must attain a certain minimum level of constitutional compliance." *Id.* at 319 (citing *Liddell v. Caldwell*, 546 F.2d 768 (8th Cir. 1976)). Consequently, when a proposed settlement is on the table,

> [a] federal court cannot permit an agreement between counsel for the defendants and counsel for the plaintiff class seriously to undercut the constitutional policy requiring desegregation of our nation's schools; this is true even where the class members themselves do not oppose a particular settlement. At the same time, however, the court cannot disregard the desire of the litigants amicably to settle their litigation nor can it ignore the substantial benefits which can accrue to both the class members and the general public from a fair and adequate settlement of a school desegregation controversy.

*Armstrong*, 616 F.2d at 319.

Thus, the district court must delicately balance these competing interests before deciding whether the proposed settlement is fair. The bottom line, as the *Armstrong* court explained, is that

> no settlement [should] be approved which either initiates or authorizes the continuation of clearly illegal conduct. A school desegregation settlement which authorizes clearly unconstitutional behavior is, on its face, neither fair, reasonable nor adequate as required by the class action standard. In applying this principle, however, the court must not decide unsettled legal questions; any illegality or unconstitutionality must appear as a legal certainty on the face of the agreement before a settlement can be rejected on this basis.

*Id.* at 319-20 (internal citations omitted).

Significantly, in assessing whether the settlement is fair, equitable, and reasonable, "the district court must not forget that it is reviewing a settlement proposal rather than ordering a remedy in a litigated case." *Id.* at 314-15. Accordingly, "*[b]ecause settlement of a class action, like settlement of any litigation, is basically a bargained for exchange between the litigants, the judiciary's role is properly limited to the minimum necessary to protect the interests of the class and the public. Judges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel.*" *Id.* at 315 (emphasis added).

Nos. 07-6076/6363      *Robinson, et al. v. Shelby County Bd. of Educ.*          Page 7

The Eighth Circuit Court of Appeals echoed these sentiments in *Little Rock Sch. Dist.*, a case in which it reversed a district court's rejection of a joint motion to settle the Little Rock, Arkansas, school desegregation case:

> The most important fact about the present appeals is that they arise out of settlements agreed to by all parties in the District Court. We believe the District Court erred by failing to give sufficient weight to that fact. It treated the case almost as if it were a fully contested matter . . . . We respectfully disagree with this approach. The law strongly favors settlements. Courts should hospitably receive them. This may be especially true in the present context – a protracted, highly divisive . . . litigation, any lasting solution to which necessarily depends on the good faith and cooperation of all the parties, especially the defendants. As a practical matter, a remedy that everyone agrees to is a lot more likely to succeed than one to which the defendants must be dragged kicking and screaming.
>
> This does not mean that a court must automatically approve anything the parties set before it . . . . [T]his is a class action, and courts are not obliged (indeed, they are not permitted) to approve settlements that are unfair to class members, or negotiated by inadequate class representatives.
>
> * * *
>
> We are bound to respect this factual agreement by the parties. There is no evidence in this record to contradict it, and we must believe that counsel for the [] intervenors are the best defenders and guardians of the interests of their own clients. *This is, after all, no ordinary litigation.* The NAACP Legal Defense and Educational Fund, its lawyers and its predecessors, have vigorously prosecuted this case and its ancestors for more than 30 years. *Absent an extremely good reason – and we have been given none – we are reluctant to disregard their judgment as to what is best for their own clients.*

*Little Rock Sch. Dist.*, 921 F.2d at 1383, 1386 (emphasis added).

We, too, endorse this approach, which "take[s] into account . . . the special concerns implicit in [civil rights] class action settlements while still preserving the essential character of settlement of a lawsuit." *Armstrong*, 616 F.2d at 315. Thus, while the district court should not give "rubber stamp approval" in lieu of independent review to the parties' joint unitary status motion, *id.*, it must afford considerable weight to the

joint motion when it is reasonable, filed in good faith, and demonstrates that the constitutional mandate requiring desegregation has been satisfied.

## III.

In evaluating the district court's partial rejection of the parties' joint motion for unitary status, it is important that we briefly highlight the legal precedent that forms the backdrop of this prolonged desegregation litigation.

> The duty and responsibility of a school district once segregated by law is to take all steps necessary to eliminate the vestiges of the unconstitutional *de jure* system. This is required in order to ensure that the principal wrong of the *de jure* system, the injuries and stigma inflicted upon the race disfavored by the violation, is no longer present. This was the rationale and the objective of *Brown I* [*v. Bd. of Educ.*, 347 U.S. 483 (1954)] and *Brown II* [*v. Bd. of Educ.*, 349 U.S. 294 (1955)].

*Freeman v. Pitts*, 503 U.S. 467, 485 (1992).

The Supreme Court has held that the "transition to a unitary, nonracial system of public education was and is the ultimate end" of its desegregation jurisprudence. *Green v. County Sch. Bd. of New Kent County*, 391 U.S. 430, 436 (1968) (citing *Brown I*, 349 U.S. at 299-301). Although "the term 'unitary' is not a precise concept," *Freeman*, 503 U.S. at 487, the Supreme Court identified certain features of the school system that must be freed from racial discrimination before the desegregation process will be deemed successful and local control will be allowed to resume:   student assignment, faculty assignment, staff assignment, facilities and resources, transportation, and extracurricular activities. *Green*, 391 U.S. at 435.

The Court has since provided guidance for determining whether a school district has met its obligation under a desegregation decree. "The ultimate inquiry is whether the [constitutional violator] ha[s] complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable." *Missouri v. Jenkins*, 515 U.S. 70, 89 (1995) (citation and internal quotation marks omitted). The Court has described a number of factors to consider, including:

Nos. 07-6076/6363   *Robinson, et al. v. Shelby County Bd. of Educ.*   Page 9

whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn; whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system; and whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance.

*Freeman*, 503 U.S. at 491.

Finally, the Supreme Court has emphasized that the extreme remedy of federal judicial supervision of local school systems was intended to be a temporary act limited to curing the effects of prior discrimination. "Returning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system." *Freeman*, 503 U.S. at 490. Thus,

[s]uch decrees, unlike the one in [*United States v.*] *Swift* [*& Co.*, 286 U.S. 106, 119 (1932)], are not intended to operate in perpetuity. Local control over the education of children allows citizens to participate in decisionmaking, and allows innovation so that school programs can fit local needs. *Milliken v. Bradley*, 418 U.S. 717, 742 (1974) (*Milliken I*); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 50 (1973). The legal justification for displacement of local authority by an injunctive decree in a school desegregation case is a violation of the Constitution by the local authorities. Dissolving a desegregation decree after the local authorities have operated in compliance with it for a reasonable period of time properly recognizes that "necessary concern for the important values of local control of public school systems dictates that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination.

*Bd. of Educ. of Oklahoma City v. Dowell*, 498 U.S. 237, 248 (1990) (citations omitted).

IV.

In the present case, the district court denied unitary status in the areas of student assignment, faculty integration, and extracurricular activities. As we explain below, the district court abused its discretion by not affording sufficient weight to the parties' joint motion and its factual basis.

Nos. 07-6076/6363     *Robinson, et al. v. Shelby County Bd. of Educ.*     Page 10

### A.  Student Assignment

On the issue of student assignment, the district court found that the parties failed to satisfy an evidentiary burden imposed by the court:

> Applying these principles to the case at hand, the Court finds that the County is not presently in compliance with its constitutional obligations with regard to student assignment. As explained *supra*, the racial composition of the majority of the County schools is substantially disproportionate to that of the district as a whole. *The Board has made no showing* that racial balance is infeasible either generally or with regard to certain schools. Furthermore, *the record does not indicate* that the County has at any time accomplished its objectives; in fact, after making considerable progress towards desegregation, the County has seemingly drifted from any serious focus on desegregation.
>
> While demographic factors, including those caused by annexation of portions of the County by the City of Memphis, have clearly played a part in creating the present racial composition of the County schools, *the County has not met its burden of showing* that it would have achieved its goal had it not been for these factors. Furthermore, as the Supreme Court has articulated, the Board's decisions with regard to school construction and zoning have necessarily played an influential role in those demographic shifts. *Consequently, the Court must assume* that the remaining significant disparity in racial composition among the schools is a product of past *de jure* segregation.

(Footnote omitted; emphasis added.)

During the forty-five years of this litigation, the racial composition of the students attending the Shelby County Schools has fluctuated widely. Although the school district's overall student population and minority enrollment have grown rapidly, the percentage of African-American students in the Shelby County Schools has varied significantly: 28 percent in 1969; 30 percent in 1971; 15 percent in 1984; 22 percent in 2001; 32 percent in 2005; and 34 percent in 2007. The district court attributed much of the racial ratio changes to annexations by the City of Memphis: "In 1984, the percentage of black students systemwide had dropped precipitously, apparently largely due to annexation into the City of Memphis of portions of the County . . . ." Further, at the district court's January 26, 2007, hearing, Assistant Board Superintendent Maura Black

Nos. 07-6076/6363     *Robinson, et al. v. Shelby County Bd. of Educ.*     Page 11

Sullivan testified that if the planned City of Memphis annexations are implemented, Shelby County Schools' African-American student ratio will decrease to 7.68 percent.

It is undisputed that political and social decisions beyond defendant Board's control have affected and continue to impact the racial ratio of the Shelby County students. These influences are not causally related to defendant's violation of the Constitution and fall outside of the scope of the court's equitable powers to restore the victims of discrimination to the position they would have occupied absent the violation. As the Supreme Court explained in *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1 (1971):

> Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial compositions of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system . . . . [Therefore,] in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary.

*Id.* at 31-32. As we further explained in *Reed v. Rhodes*, 179 F.3d 453 (6th Cir. 1999):

> That there was racial imbalance in student attendance zones was not tantamount to a showing that the school district was in noncompliance with the decree or with its duties under the law. Racial balance is not to be achieved for its own sake. It is to be pursued when racial imbalance has been caused by a constitutional violation. Once the racial imbalance due to the *de jure* violation has been remedied, the school district is *under no duty to remedy imbalance that is caused by demographic factors.*

*Id.* at 466 (quoting *Freeman*, 503 U.S. at 494) (emphasis added).[5]

In granting unitary status in three of six areas, the district court "recognize[d] the great progress the Board has made in desegregating its schools." Further, the court

---

[5]In *Reed*, we affirmed the district court's order holding that the Cleveland City School District was entitled to a declaration of unitary status with respect to pupil assignments, where the district's record of compliance stood as an unequivocal manifestation of good faith and "[t]he demographics of recent years have reflected rapid population shifts within the city that were not caused by or attributable to the Cleveland School District." *Reed*, 179 F.3d at 467 (citation omitted).

Nos. 07-6076/6363      *Robinson, et al. v. Shelby County Bd. of Educ.*      Page 12

found "no evidence that there has been racial discrimination by the County in the areas of facilities, transportation or staffing during the last few decades of this case." Although the district judge acknowledged at a status conference that *de jure* racial discrimination no longer exists in the school district, she nonetheless continued federal court supervision of student assignment because, in her opinion, the racial ratio in individual schools was "uneven." The district judge cited the school district's new state-of-the-art Southwind High School as an example of such unevenness; Southwind was expected to open in the fall of 2007 with an African-American student population of approximately 88 percent.

In determining whether the present racial "unevenness" is properly subject to the court's equitable remedies, we must decide if the current conditions are vestiges of the prior unconstitutional *de jure* system or the products of other actions or conditions. *Reed*, 179 F.3d at 466. Following oral argument and our review of the record and briefs, we conclude that the lower court clearly erred in finding the former, rather than the latter.

In the past decades, the vestiges of the racially segregated Shelby School system have been dismantled. A new "unitary, nonracial system of public education," *Green*, 391 U.S. at 436, has risen in its place for which the parties are justifiably proud. The record reveals that the racial "unevenness" that currently exists in individual schools is not the product of defendant's forty-five- year-old constitutional violation. Rather, with the passage of time and court intervention, other dynamics have now shaped the district into its current form. The annexations by the City of Memphis, along with voluntary housing choices made by the public, have drastically altered the racial composition of the school district. In addition, school construction and student boundaries (including the new Southwind High School) *approved by the district court* over the past few decades have affected the present racial unevenness. Although the district court now faults itself for "rubber-stamp[ing]" school construction and zoning requests (JA 116), its role in managing and shaping the school district cannot be ignored.

Nos. 07-6076/6363     *Robinson, et al. v. Shelby County Bd. of Educ.*     Page 13

Finally, the Supreme Court requires that we consider "whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance." *Freeman*, 503 U.S. at 491.

On this issue, we are greatly influenced by the position of plaintiffs. The plaintiffs fought this battle to desegregate the Shelby County Schools. They are the students, and now parents or grandparents, who suffered from the constitutional violation. In their view, the battle has been won. They now ask that we declare the school district to be a unitary, nonracial system of public education. We afford great weight to the appraisal of the most interested parties to this litigation, particularly where the record illustrates defendant's compliance with the desegregation order through the creation of remedial programs targeting racial inequities and the construction of state-of-the-art facilities. *See Reed*, 179 F.3d at 466-67 (citing the school district's initiatives "designed to develop self-esteem and enhance the academic potential of all students regardless of race" and other corrective measures taken in African American schools "to involve parents and offset negative socioeconomic factors" as evidence of the district's good-faith efforts to desegregate the school system). Under the circumstances, defendant has satisfactorily complied with the student assignment portion of the desegregation decree and therefore is entitled to a declaration of unitary status with respect to this component.

## B. Faculty Integration

For the reasons previously stated, and those recited below, we also hold that the district court clearly erred in rejecting unitary status as it pertains to faculty integration.

In this regard, the district court found that defendant Board was likewise "not in full compliance" with the law because the African-American teacher ratio varied in individual schools from five percent to thirty percent. In "hindsight," the court acknowledged that its prior "focus on this aspect was ill-conceived." Although noting that "a school desegregation plan is not an affirmative action program for teachers," the

Nos. 07-6076/6363    *Robinson, et al. v. Shelby County Bd. of Educ.*    Page 14

court reversed its previous approach by directing that the racial ratio of the faculty match the racial composition of the student population as a whole:

> On this ground, the Court finds that, rather than tying the racial composition of a school's faculty to that of the population of teachers in the system as [a] whole, it should be linked instead to the racial composition of the *student* population. Accordingly, the Court finds it necessary to depart from its prior directives and *concludes that the County's constitutional obligations require the achievement of a racial balance reflective of the systemwide student population*, within a margin of error to be enumerated below and subject to mitigating circumstances and a feasibility requirement, as developed *supra*.

(Footnote omitted; first emphasis in original, second emphasis added.)

The intervenor United States appeals this remedy arguing that it is unprecedented and would result in a "bizarre" and "racially discriminatory hiring and firing" of teachers to keep pace with the ever-changing racial dynamics of the student population.

At the hearing of January 26, 2007, Assistant Superintendent of Human Resources Lois Williams, who is African-American, testified about the Board's extensive efforts to recruit minority teachers. Ms. Williams testified that under the supervision of minority recruiter Eddy Jones, who is also African-American, the Board, during 2005-2006, visited over fifty-five colleges and universities, including "13 historically black colleges and universities in an effort to recruit minority candidates for teaching positions in the Shelby County Schools."

When asked if her decision-making would change if the case were dismissed, Ms. Williams responded:

> Q.    [Mr. Winchester] Okay. And you understand that we're asking the court to dismiss the Robinson case and – and be free from judicial court scrutiny of our recruiting and hiring practices:
>
> A.    [Ms. Williams] I do understand that, sir.
>
> Q.    And if that occurs do – do you have thoughts or opinions as to whether any of the efforts that are currently undertaken by the school – by the school board to recruit, hire, and retain minority faculty and administrators would change in any way whatsoever?

Nos. 07-6076/6363        *Robinson, et al. v. Shelby County Bd. of Educ.*        Page 15

A.    I don't see that it would change.

The superintendent, when Dr. Webb mentioned that he came to the Shelby County schools, he held a meeting with human resources and he asked if that department was equipped to recruit, retain and maintain high quality employees.

He asked about the minority recruitment effort which he was well aware of the court order.

The superintendent has empowered me to make decisions based upon what's best for the students in Shelby County schools, and we recognize that our schools need to be reflective of the communities that they live in.

The superintendent has also empowered me to make decisions based on the staffing within our schools.

And so, as we look to recruit, retain, train and maintain highly qualified teaching staff, we certainly have an emphasis on being inclusive and making certain that our school district is reflective of our student population, the community and the world that we live in to prepare students.

Without citation to the record, the district court found that the defendant Board was "not in full compliance with its obligations under the law." We respectfully disagree.

In striking down a similar student-based racial hiring plan in *Oliver v. Kalamazoo Bd. of Educ.*, 706 F.2d 757 (6th Cir. 1983), we explained that "students . . . do not have a constitutional right to attend a school with a teaching staff of any particular racial composition. Rather, with respect to the teaching staff, all that the students are entitled to is the 'sustained good faith effort to recruit minority faculty members so as to remedy the effects of any past discriminatory practices.'" *Id.* at 762 (quoting *Fort Bend Indep. Sch. Dist. v. City of Stafford*, 651 F.2d 1133, 1140 (5th Cir. 1981)).[6] Instead, the court's orders should require that "the faculty of each school reflect the systemwide racial ratio of faculty members. . . ." *United States v. DeSoto Parish*

---

[6]In *Fort Bend Indep. Sch. Dist.*, the court held that "a formerly segregated school system need not employ a faculty having a racial composition substantially equivalent to that of its student body in order effectively to desegregate its schools and attain unitary status" and concluded that "[t]he district court erred in imposing such a requirement." 651 F.2d at 1138.

Nos. 07-6076/6363        *Robinson, et al. v. Shelby County Bd. of Educ.*        Page 16

*Sch. Bd.*, 574 F.2d 804, 816 (5th Cir. 1978); *United States v. Montgomery County Bd. of Educ.*, 395 U.S. 225, 232 (1969).

Here, as the United States rightly argues, imposition of the district court's proposed faculty hiring goals would "effectively turn the purpose of the desegregation remedy on its head" through the discriminatory hiring and recruitment of faculty:

> Compliance with the district court's new faculty assignment plan in this case could require racially discriminatory hirings and firings. If, in any given year, the Board has too few black faculty to staff each school within 15% of the systemwide student body, it must fire non-black faculty and hire an equivalent number of black faculty in order to meet the court's requirements. This bizarre and unconstitutional reshuffling would be repeated as the student population in Shelby County shifts as a result of annexation or changing residential patterns, leaving more teachers jobless with every racial recount of the student body.

As the Supreme Court stated in *Swann*, "where it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staff," there is a prima facie constitutional violation. *Swann*, 402 U.S. at 18; *see also Green*, 391 U.S. at 434-35. We find ourselves in agreement with Chief Justice Roberts that "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Schools v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007) (plurality). Race-based hiring of the sort ordered by the district court violates the Constitution.

Moreover, we agree with the United States that the district court's assertion that each child is constitutionally entitled to "educational guidance which includes teachers of the student's own race" is invalid. The Constitution requires only that schools be staffed so that no school is racially identifiable based on governmental action. *Montgomery County Bd. of Educ.*, 395 U.S. at 236. As the United States correctly contends,

> Taken to heart, the court's "role model" principle could lead to an *increase* in racially identifiable schools as majority black schools are increasingly staffed with black faculty. Conversely, the "role model" theory "could be used to escape the obligation to remedy [hiring

Nos. 07-6076/6363    *Robinson, et al. v. Shelby County Bd. of Educ.*    Page 17

discrimination] by justifying the small percentage of black teachers by reference to the small percentage of black students." *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 276 (1986).

In *Wygant*, the Supreme Court expressly rejected the "role model theory" as a basis for racially based layoff protections because it "allows the Board to engage in discriminatory hiring and layoff practices long past the point required by any legitimate remedial purpose." *Id.* at 275. The district court's ruling in the instant case directly contradicts this principle.

Finally, as previously discussed *supra*, the record clearly shows that the racial disparity ratio from school to school for teachers is not the product of a constitutional violation, but of other demographic trends. Therefore, the vestiges of the post-constitutional violation regarding faculty integration have not been demonstrated. In light of the abundant evidence of the Board's good faith efforts to recruit and hire minority faculty despite a state-wide minority teacher shortage, the district court abused its discretion in failing to afford greater weight to the factual basis submitted by the parties on this issue and in denying their joint motion.

### C. Extracurricular Activities

The district court also denied the parties' joint motion for unitary status regarding extracurricular activities. The only explanation for this ruling is the following footnote: "The Court determined that the issue of extra-curricular activities requires further inquiry before declaring unitary status as to that area."

We conclude that the district court clearly erred by rejecting, without explanation, the joint motion of the parties. "[T]he district court must clearly set forth in the record its reasons for approving [or rejecting] the settlement in order to make meaningful appellate review possible. This is particularly important in civil rights class actions." *Armstrong*, 616 F.2d at 315 (citations omitted). Absent reasons and evidence to the contrary, the joint motion was entitled to substantial weight in the exercise of the court's discretion. The victims of defendant's past violation of the Constitution are satisfied with the commitment and success achieved by the Shelby County Schools in

Nos. 07-6076/6363      *Robinson, et al. v. Shelby County Bd. of Educ.*      Page 18

the area of extracurricular activities.  Absent a reasonable explanation, the district court abused its discretion in ruling otherwise.

V.

For these reasons, we reverse in part the order of the district court and remand with instructions to grant in full the parties' joint motion for declaration of unitary status, dissolve all outstanding orders and injunctions as to the Board and its members, and dismiss this action.

------

## DISSENT

------

ALGENON L. MARBLEY, District Judge, dissenting.  In reversing the district court's carefully considered judgment denying unitary status to the Shelby County Schools on the subjects of student desegregation, faculty desegregation, and extracurricular activities, the majority's reasoning comes to this:  the parties have jointly stipulated to dismissal and such compromises should be encouraged by the courts, especially in the divisive realm of school desegregation.

I have no particular quarrel with this general principle, but I do not believe that the virtues of compromise can compensate for the lack of evidence substantiating that the County has in fact eliminated, to the extent practicable, all remaining vestiges of unlawful discrimination.  Nothing—not the agreement of the parties  jointly to seek dissolution of the desegregation decree, not the number of years that this case has been pending and the general progress in race relations nationwide that has occurred in that time, and not the eagerness of the courts or school boards to restore local control over community schools—can substitute for evidence showing the Board's compliance with the desegregation decree.  The evidence in fact reveals that among the forty-four schools for which the Board has data, two thirds of them are not in compliance with the flexible benchmark set forth by the district court for measuring racial balance.  Furthermore, the district court has been managing this case since 1963.  Based on the court's knowledge and experience with this case, it is in the best position to judge the evidence and determine whether dissolution of the desegregation decree is appropriate at this time.  Because the parties have not carried their burden of showing that the racial disparities that continue to plague the County's schools are not the vestiges of past unlawful discrimination, I would affirm the district court's judgment.

Nos. 07-6076/6363    *Robinson, et al. v. Shelby County Bd. of Educ.*    Page 20

## I. BACKGROUND

### A. The History of Desegregation in Shelby County

The majority opinion does not recount the history of this lengthy and complicated case. Because I believe that we must consider the entire record to evaluate properly the district court's judgment, I set forth the most important facts of the case below.

#### 1. *1963-1971*

The years between 1963 and 1971 were by far the most active in the case's history. This period was marked by the County's early intransigence in adopting appropriate measures to de-segregate its schools, the intervention of the Department of Justice (the "Government") to pressure the County to take its desegregation obligations seriously, and ultimately, in 1971, the district court's approval (following a reversal and remand by this Court) of a comprehensive plan to eliminate the racial identifiability of all the County's schools.

On June 12, 1963, nine years after *Brown v. Board of Education*, 347 U.S. 483 (1954) was decided, twenty-one public-school students brought this class action against the Shelby County Board of Education (the "Board") seeking a declaratory injunction that the public schools were unconstitutionally segregated and an injunction requiring the Board to integrate them. (Joint Appendix ("JA") 156.) In response to the Plaintiffs' complaint, the Board denied any wrongdoing, but nonetheless submitted a plan to the district court, which approved it on March 17, 1964. (JA 156-160.)

This first effort amounted to no more than a "freedom-of-choice" plan, and it barely qualified as that. "Freedom-of-choice" plans purported to put an end to segregated schools by permitting African-American students voluntarily to choose to attend the all-white schools from which they had long been excluded. The Board's plan, however, erected numerous obstacles to exercising free choice. It conditioned the transfer of African-American students into white schools on a showing of good behavior, acceptable academic performance, sufficient family income, and psychological stability. (JA 158.)

Nos. 07-6076/6363       *Robinson, et al. v. Shelby County Bd. of Educ.*       Page 21

In 1966, two years after the district court approved the Board's freedom-of-choice plan, the Government intervened in the case. (JA 160.) In response to a Government motion criticizing the Board for lack of progress in desegregating its schools, the district court entered an order making minor modifications to the decree, but these changes still did not promise to make the mandate of *Brown* a reality. (JA 162-63.) By 1967, four years after the Plaintiffs filed suit, and thirteen years after *Brown*, 100 percent of white students attended the formerly all-white schools and 98.7 percent of African-American students attended the formerly all-black schools. (JA 165.)

On January 19, 1967, in response to another Government motion contending that the Board was shirking its desegregation obligations, the district court again modified the decree. (JA 284.) The district court tinkered with the plan to make it slightly easier for African-American students to transfer to the formerly all-white schools, but the anemic "freedom-of-choice" approach still ruled the day. Although continuing to fall short in terms of desegregating the student bodies of the Shelby County Schools, the district court's January 19, 1967 order was notable because for the first time it spelled out precise benchmarks for desegregating the County's faculties. (JA 284.) The court held that a faculty would be regarded as desegregated when its racial composition reflected the County-wide composition within a deviation of ten percentage points. (JA 286.) To that end, the court ordered the Board to fill all faculty vacancies with teachers whose race was under-represented in the school at issue. (JA 286.) In addition, the district court ordered the Board to implement a program to recruit white teachers to work in schools whose faculties were predominantly African-American and African-American teachers to work in schools with predominantly white faculties. (JA 287.)

To measure the Board's compliance with these requirements, the district court ordered it to file certain reports on a regular basis. First, before filling a faculty vacancy with a teacher of the over-represented race, the Board was required to notify the Court of its intention to do so, as well as explain its efforts to transfer or hire a teacher of the under-represented race and why those efforts failed. (JA 288-89.) In its July 26, 2007 order declining to dissolve the desegregation decree, the district court found that

Nos. 07-6076/6363     *Robinson, et al. v. Shelby County Bd. of Educ.*          Page 22

throughout this litigation, the Board has never once filed this report before transferring/hiring a teacher of the over-represented race to fill a vacancy.[1]

Second, the Board was instructed to submit, on August 1 of each year, a report providing data on the racial make-up of the faculty in each school, as well as the number of vacancies that were filled by faculty of the over-represented race. (JA 289.) The August 1 report was to be supplemented on October 1 of each year. (JA 289.)

On August 1, 1967, the Board submitted its first annual report on teacher desegregation. This report showed that the Board employed 1500 teachers. Pursuant to the district court's order that the Board re-assign teachers of the opposite race "in all cases in which the transfer can be accomplished without seriously impairing the educational program," (JA 287), the Board reported that it had re-assigned just 128 teachers, or 8.5 percent of the total number. The Board's October supplement showed that of the 200 vacancies filled for the upcoming school year, only twelve of these were filled by teachers of the under-represented race.

On May 27, 1968, the Supreme Court decided *Green v. County School Board of New Kent County*, 391 U.S. 430 (1968). There, the Court held that "freedom-of-choice" plans were generally inadequate to satisfy the mandate of *Brown*. Leaving no doubt about the gravity of the responsibility facing local school boards, the *Green* Court stated, "The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now*." *Id.* at 439. School boards were instructed to take whatever remedial steps were required to eliminate racial discrimination "root and branch." *Id.* at 438.

The district court issued another order on July 17, 1968, clarifying the Board's desegregation responsibilities in light of *Green*. (JA 171.) As to faculty desegregation, the court reiterated that the ratio of African-American to white teachers in each school was to reflect the County-wide ratio within a margin of ten percentage points. The court held that this ratio had to be satisfied in the County's elementary schools (defined as

---

[1]The Board does not dispute this finding.

grades one through six) by the start of the 1968-69 school year and that it was to be met in the remainder of the County's schools by the start of the 1969-70 school year. (JA 172.) The court further ordered the Board to prepare a new desegregation plan designed to accomplish these goals and otherwise eliminate the racial identifiability of the County's schools. (JA 172.)

On August 15, 1968, the district court provided additional guidance about the preparation of the Board's new desegregation plan. (JA 173.) For the first time, the district court set a benchmark for desegregating the County's student bodies. The court ruled that insofar as feasible, the Board should assign students so that the ratio of African-American to white students in each school reflected the County-wide ratio, within a margin of ten percentage points. (JA 173.)

The Board submitted its post-*Green* plan for the district court's review on January 15, 1969. This plan did not come anywhere close to achieving the student racial balance that the district court had ordered. (JA 175.) The Board admitted that its plan did not require the desegregation of high school students, but instead permitted them to remain in the high schools that they were already attending. (JA 175.) As to faculty desegregation, the Board sought relief from the obligation of achieving any particular racial ratio among high school teachers, let alone that specified by the district court (a black-to-white ratio in each school that reflected the ratio in the County as a whole, plus or minus ten percentage points). (JA 174.) The Board argued that the work of desegregating high school faculties was made more difficult by the fact that these teachers were licensed in particular subject areas.

The Plaintiffs and the Government opposed the Board's post-*Green* plan as inadequate. (JA 175-78.) The district court nonetheless approved it.

On April 6, 1970, the district court approved certain modifications to the Board's desegregation plan. *See Robinson v. Shelby County Bd. of Educ.*, 311 F. Supp. 97, 104-05 (W.D. Tenn. 1970). Importantly, the court backed away from its earlier insistence that the County achieve a student racial composition within each school that reflected the County racial composition within ten percentage points. Rather, the court held that

Nos. 07-6076/6363    *Robinson, et al. v. Shelby County Bd. of Educ.*    Page 24

the Board was not required to achieve any particular degree of racial balance among its students and that the most that could be asked was for the Board to "honestly draw[] unitary geographical zone lines, that is, zones not gerrymandered to preserve segregation . . . ." *Id.* at 102. The court stood by its prior pronouncements with respect to faculty desegregation  but added the caveat that efforts to de-segregate high school teachers should be tempered by considerations of their qualifications. The court stated, "to the extent feasible, in the light of the qualifications of the teachers and the need for teachers of particular qualifications in the [secondary] school, such teachers will be assigned and transferred so that the ratio of white to Negro teachers in each school will be, within a tolerance of 10%, the same as in the system as a whole." *Id.* at 105.

On appeal of the district court's April 6, 1970 order, this Court remanded the case for further consideration of the County's desegregation obligations. *See Robinson v. Shelby County Bd. of Education*, 442 F.2d 255, 258 (6th Cir. 1971). This Court held that the district court had misapprehended the extent of the County's affirmative duty to undo the effects of its past discriminatory conduct. *Id.* at 258 ("Where there has been a history of state-imposed segregation of the schools, it is not sufficient to adopt a plan which, out of context, might be seen as nondiscriminatory but which does not do as much to disestablish segregation as an alternative proposal which is feasible and pedagogically sound.").

In response, the district court approved a revised desegregation plan in August 1971. *See Robinson v. Shelby County Bd. of Educ.*, 330 F. Supp. 837, 843-47 (W.D. Tenn. 1971), *aff'd* 467 F.2d 1187 (6th Cir. 1972). This plan was largely that advanced by the Board, but the district court also accepted certain suggestions from the Title IV Center at the University of Tennessee, as well as the Government. *Id.* at 843. This latest effort apparently dealt exclusively with student desegregation. *Id.*

Nos. 07-6076/6363       *Robinson, et al. v. Shelby County Bd. of Educ.*       Page 25

## 2. *1971-2006*

The Board's 1971 desegregation plan approved by the district court marked the last substantial revision to the Board's desegregation efforts in the history of this case. It was also virtually the last time that either the Plaintiffs or the Government challenged any of the Board's decisions as contrary to its desegregation obligations, or argued that the Board was not complying with the plan's requirements. Perhaps due in large part to the lack of adversarial litigation, the record is rather thin on evidence showing what progress, if any, the Board made toward dismantling the vestiges of unlawful discrimination in its schools. It appears that neither the Plaintiffs, the Government, nor the district court required much in the way of statistical data tracking the racial composition of the County's students and faculty over time.

To begin with, very little can be gleaned from the record about what was happening with student desegregation. There is almost no evidence documenting the racial composition of each school from year to year (and comparing that to the County-wide ratio), the indicators the Board used, if any, to gauge its progress, the obstacles the Board confronted, or how it made decisions in operating the County's schools to ensure its full compliance with the desegregation decree. The definition of "success" and the Board's path to arrive there are not clear. For instance, between August 20, 1974 and August 3, 2004, the district court entered more than fifty consent orders modifying the decree as to such things as school-attendance zones and new-school construction. (JA 192-234.) It appears that the Board rarely provided information about the impact these modifications would have on the student racial composition of each of the schools. The record suggests that the Board often did no more than conclusorily state that the changes were not expected to have any deleterious effects on the desegregation plan. (*See, e.g.,* JA 219-26.)

Moreover, Plaintiffs rarely interposed any objections to the Board's plans and the same was true of the Government. On one of the few occasions that serious opposition to the Board's plans was lodged, the district court found that the Board had allowed improper considerations to trump its desegregation duties. The dispute centered on the

Nos. 07-6076/6363    *Robinson, et al. v. Shelby County Bd. of Educ.*    Page 26

Board's desire in 1985 to add ten new classrooms to an overwhelmingly white elementary school to alleviate over-crowding. (JA 203.) The Government opposed the construction project (it does not appear that the Plaintiffs joined the Government), claiming that the Board impermissibly wanted to avoid utilizing the excess capacity of nearby elementary schools with significant African-American populations. (JA 203-04.) On April 8, 1986, the district court denied the Board's petition to build the extra classrooms. (JA 209.) The court agreed with the Government that the Board had failed to give due consideration to its desegregation obligations, and that it had elevated "community pride" (meaning the community pride of the white elementary school students and parents) in preserving present enrollment at the over-crowded elementary school over its duty to eliminate unlawful discrimination. (JA 209-10.)

The record regarding faculty desegregation between 1971 and 2006 is only slightly more robust. After the Board's initial report on August 1, 1967, the record is silent about the Board's efforts to re-assign teachers. As noted above, the Board reported that it had re-assigned 8.5 percent of its teachers, effective during the 1967-68 school year. The record does not disclose whether the Board undertook any more re-assignment efforts after 1967. Certainly, the Board does not state in its briefing to this Court that it did so, nor does it point to any evidence of such. Thus, it appears that in response to the district court's January 19, 1967 order, the Board had done all the faculty re-assigning it intended to do by August 1, 1967.

With respect to teacher transfers to fill vacancies, the district court had instructed the Board to file annual reports showing the number of openings filled by teachers of the over-represented and under-represented race. Between 1974 and 1979, the Board's reports show that half the time, a majority of vacancies were not filled by teachers of the under-represented race (as ordered by the district court). (JA 133; 194-95; 198-201.) It appears that the Board stopped reporting this statistic altogether by 1981. Neither the Plaintiffs, the Government, nor the district court seems to have taken issue with the Board's abandonment of this requirement. In addition, although the Board was supposed to notify the court *before* filling a vacancy with a teacher of the over-represented race

Nos. 07-6076/6363    *Robinson, et al. v. Shelby County Bd. of Educ.*    Page 27

and justify its inability to employ an opposite-race teacher, the record is bereft of any evidence that the Board ever did so, and the Board does not dispute that it did not.

Besides the Board's lackluster track record as to faculty re-assignment and vacancies, the record discloses another deeply disturbing trend. Between 1974 and 2006, the total percentage of African-American faculty at the County's schools declined markedly. The Board's 1974 annual report showed that thirty-three percent of the County's faculty were African-American, which correlates closely to the fact that around this same period, thirty percent of the County's students were African-American. In 2006, only fifteen percent of the County's faculty were African-American, even though around this same period, a significantly higher percentage, thirty-four percent, of the County's students were African-American.

In August 1989, the district court was so disturbed by the decline in the Board's employment of African-American teachers that it asked the parties to address the question of whether the Board's reports "for the reporting period of August 1, 1985, to August 1, 1989, indicate an employment practice or policy within the Shelby County Schools which achieves a gradual but definite decline in the number of black teachers employed by the school system." (JA 214.) The Board responded that the problem was attributable to fewer African-American people becoming teachers. (JA 214.) The Government had a different position, noting that between 1972 and 1989, the number of white teachers had more than doubled, but the number of African-American teachers had remained virtually the same, that the Board had "recruited almost 10 times as many white applicants as black applicants," and that its offer rate for white candidates was much higher than for African-American candidates. (JA 215.) The Government also cited statistics showing that the Memphis City Schools (located within Shelby County, but not part of the Shelby County school system) did a much better job of recruiting African-American applicants, even though the starting salary for teachers in Memphis was slightly less than that offered by the Board. (JA 215-16.) The Government also argued that the Board was much less proactive than it could have been in its outreach to colleges and universities, particularly to historically African-American colleges. (JA

Nos. 07-6076/6363        *Robinson, et al. v. Shelby County Bd. of Educ.*        Page 28

216.)  On July 3, 1990, the district court ordered the Board to submit supplemental annual reports regarding its minority recruiting practices.  (JA 218.)

The Board filed regular supplemental reports on minority recruiting between 1990 and 2006.  These reports both confirm that the Board expanded its outreach to colleges and universities, including historically African-American colleges, and provide data on the offer rates for African-American and white candidates.  In the early years, offer rates for African-American candidates sometimes exceeded those for white candidates;  but by 1997, offers to white candidates always outpaced offers to African-American candidates, sometimes significantly.  *See, e.g.,* JA 228 (October 1999 report showing that twenty-six percent of African-American applicants interviewed through the central office were given offers, compared to fifty-one percent of white applicants).

Thus, the extent of the Board's compliance with the desegregation decree between 1971 and 2006 is difficult to assess.  During that time, the Plaintiffs never challenged any of the Board's decisions.  Similarly, the Board did not apprise the court (and the court apparently did not inquire) of any factors that impeded its progress desegregating as much as practicable or any steps it took to alleviate those impediments. The Board did not even bother to submit the required reports on faculty desegregation. Whether the racial disparities that continue to mark the Shelby County Schools are due to reasons wholly unrelated to the ongoing effects of unlawful discrimination, as the majority contends, or whether the Board could and should have done more to attain its desegregation objectives, are not answered by the record as it existed at the time the parties moved for dissolution of the decree.  Moreover, as described below, the parties did not fill this evidentiary gap at the two hearings conducted by the district court to consider their motion.

### 3.  *The Joint Motion to Dissolve the Desegregation Decree*

On August 14, 2006, the Plaintiffs and the Board jointly moved for an order dissolving the desegregation decree and declaring the public schools "unitary."  The parties asserted that they had fully complied with the decree and that they had met the standards articulated by the Supreme Court for eliminating the effects of past *de jure*

segregation. Despite the joint nature of the application, the district court recognized that it "ha[d] an obligation to independently evaluate these factors and the evidence to assure that the system as it exist[s] now is truly unitary and color blind." (JA 1187.) The court therefore held evidentiary hearings on January 26, 2007 and July 23, 2007.

The two hearings consisted largely of anecdotal testimony by school officials and parents. For example, Superintendent Bobby G. Webb testified that his staff worked diligently to adjust school attendance zones to make sure that the County has "good community-based schools and have them as diverse as we possibly can." (JA 1204.) He stated, "I can tell you without a doubt that—that all of the staff that I have to work with . . . certainly love and respect every child regardless of their color, background or whatever . . . ." (JA 1205.) When asked by the district court what evidence it should consider in determining whether the Board's efforts to promote color blindness will continue in the absence of court monitoring, Webb responded: "I personally can assure you that as long as I'm superintendent there will be no discrimination in any shape, form, or fashion." (JA 1230.)

Assistant Superintendent of Planning and Student Service Maura Sullivan testified that she had worked closely with Plaintiffs' counsel over the years to adjust attendance zones based on enrollment projections and assess the impact of the adjustments on school demographics. (JA 1239-40.) Assistant Superintendent Lois Williams described the County's efforts to recruit minority teachers. She identified the biggest barrier to minority-teacher recruitment as the shrinking teaching pool overall and the shortage among minority candidates in particular. (JA 1315.) The Board's goal, according to Williams, is for fourteen percent of the teachers in each of the County's schools to be minorities. (JA 1302.)

During the July 23, 2007 hearing, the Plaintiffs and the Board called two parents to testify. The first, Ricky Jeans, had himself been a student in the Shelby County Schools in the late 1960s and had been one of the first African-American students to attend a formerly all-white school. (JA 1378-79.) Jeans testified in favor of dissolving the desegregation decree, stating, "I think that it's time that we—we look backwards and

Nos. 07-6076/6363     *Robinson, et al. v. Shelby County Bd. of Educ.*     Page 30

see where we started at and look at the improvement of the system and what has gone on down through the years and support maybe dropping the system from this point on, but I am a big advocate of the Shelby County school system." (JA 1379.) The second, Brenda Gipson, testified that the Shelby County Schools had become more diverse both in their student bodies and faculties since she had been involved with them through her children.   Gipson testified that school administrators are "for an environment of inclusiveness—inclusiveness, they go out of their way to make sure that everyone feels important in the school system." (JA 1387.) Finally, Gipson testified that some schools in the County have a largely African-American student body but that "obviously most of the ones in my area are predominantly white." (JA 1388.)

The evidence presented at the two hearings was thus largely anecdotal and based on the personal views of the interested parties and two parents.  Neither the Board nor Plaintiffs put any school-desegregation experts on the stand to testify about the Board's performance since the desegregation decree was imposed.  Neither party put any witnesses on the stand to opine that the Board had achieved desegregation to the extent feasible or that it had availed itself of all opportunities to desegregate.  Finally, there was no expert testimony about demographic changes in the County or about how such changes should be interpreted in light of the fact that the Board had formerly practiced *de jure* segregation.

## B. The District Court's Order

On July 26, 2007, the district court issued a sixty-two page opinion, supplemented by a one-hundred-and-sixteen page "Procedural Appendix" of the case. The district court granted the parties' joint motion as to facilities, transportation, and staffing, finding that there was no evidence that the Board had been discriminatory over the last few decades in managing these aspects of the schools. (JA 115.) A declaration of unitary status was therefore found to be appropriate as to these three areas. The court, however, denied the joint motion as to student assignment, faculty assignment, and extracurricular activities and held that the court would continue to supervise these areas. (JA 116.)

Nos. 07-6076/6363     *Robinson, et al. v. Shelby County Bd. of Educ.*     Page 31

## 1. *Student Assignment*

The district court found that by 1971, the Board had begun to make real progress toward desegregating the student bodies of its schools. (JA 106.) Still, "at least a quarter of the schools remained outside the target racial composition range established by the [court]." (JA 107.) The court also noted that by 1984, the proportion of African-American students in each school continued to be "uneven," with three schools out of thirty-four having fewer than five percent African-American students and three having between fifty and seventy percent. (JA 108.) These disparities have only widened. The district court found that by the 2004-05 school year, only seventeen of the County's forty-six schools had a racial make-up that reflected, within ten percentage points, the racial make-up of the County as a whole. (JA 108.) Moreover, the County's new "state-of-the-art" high school is expected to have an eighty-eight percent or higher African-American student population. (JA 108.)

The district court concluded that "[t]he Board has made no showing that racial balance is infeasible either generally or with regard to certain schools." (JA 111.) The court further found that "the record does not indicate that the County has at any time accomplished its objectives . . . ." (JA 111.) The racial compositions of the student bodies of the individual schools relative to the County as a whole are important, reasoned the court, because such concrete and detailed statistics enable a court to gauge progress towards eliminating the "racial identifiability" of schools, which is the key to achieving unitary status. Without a statistical comparison, the court said it would be left to "rely on anecdotal evidence, gut feelings, and assurances from defendants that they 'love and respect every child regardless of their color—hardly a proper basis for making momentous legal decisions." (JA 110.) At the same time, the court recognized that "racial balance is not a strict requirement and there may be mitigating circumstances which would allow a school system to operate one or more schools with a predominance of one race or another without running afoul of its equal protection obligations . . . ." (JA 109.)

With these principles in mind, the district court directed the Board to work toward achieving racial balance in all its schools, which it defined as a student racial composition in each school that mirrors the County-wide ratio within a margin of fifteen percentage points. (JA 117.) The court characterized this benchmark as a "flexible goal" and "a starting point in analyzing the Board's success in desegregation." (JA 117.)

### 2. *Faculty Assignment*

The district court declined to grant unitary status as to faculty assignment, finding that the Board had not exhibited good-faith compliance with the court's prior desegregation orders. (JA 102-03.) The court found it "somewhat astonishing" that the Board reassigned only 128 teachers out of 1500 in response to the order directing that this be done "in all cases" provided that the educational program was not seriously impaired. (JA 103.) The court was also troubled by the lack of full compliance with the requirements for transferring teachers when vacancies arose. The district court concluded that

> Strict compliance with the new faculty integration requirement would have almost surely effected a very rapid transition to a system where the faculty at each school was reflective of the systemwide racial composition. This seems apparent because practically any vacancy at a school whose faculty was racially disproportionate would have set off a chain of intra-system transfers which would only stop when either complete racial balance was achieved or a vacancy resulted which was impossible to fill from within the system.

(JA 102.) Finally, the district court observed that the Board had "utter[ly] disregard[ed]" the requirement that it notify the court before filling a faculty opening with a teacher of the over-represented race. (JA 103.) The district court concluded that the wide gulf between the proportion of African-American teachers at various schools in the County today, ranging from a low of five percent to a high of thirty percent, showed that the Board's efforts were wanting. (JA 112.)

When it came to fashioning a remedy, the court disavowed its earlier approach of aiming to have a percentage of African-American teachers in each school that mirrored the percentage of African-American teachers in the County. (JA 113.) This

Nos. 07-6076/6363     *Robinson, et al. v. Shelby County Bd. of Educ.*     Page 33

approach, said the court, "created the perverse incentive to allow the overall black faculty representation to slip . . . ." (JA 113.) The court feared that the Board could reduce the County-wide percentage of African-American teachers by terminating African-American teachers. As the County-wide percentage fell, so too could the percentage required in each school, without raising the specter of any disparity between the two. (JA 113.)

Having identified what it deemed to be a fatal flaw with its longstanding method of measuring progress toward faculty desegregation, the district court came up with another method. It ruled that, henceforth, the proper comparison would be between the percentage of African-American teachers in a school and the percentage of African-American students in the County. (JA 114.) Thus, since the County's African-American student population stood at thirty-four percent in 2007, each school should endeavor to achieve that proportion of African-American teachers. The district court ruled that this approach was consistent with ensuring that African-American students were not "isolated" in their educational experience as a result of too few African-American teachers in their classrooms. (JA 114.) The court stated that "if a black child is allowed to attend a previously all-white school, but is denied educational guidance which includes teachers of the student's own race, the student is unacceptably isolated and deprived of a full educational experience." (JA 114.) The Court concluded that a concern about the possible "isolation" of African-American students was an "unarticulated principle that . . . animates the Supreme Court's emphasis on the importance of a diverse faculty." (JA 114.) Thus, the district court ordered the Board to work toward a faculty racial balance that would mirror the proportion of African-American students in the County as a whole, within a margin of fifteen percentage points. Just as with the student-assignment goal, the court treated this faculty goal as "flexible" and "a starting point in analyzing the Board's success . . . ." (JA 117.)

Nos. 07-6076/6363       *Robinson, et al. v. Shelby County Bd. of Educ.*       Page 34

### 3. *Extracurricular Activities*

The district court also declined to grant unitary status with respect to the Board's sponsorship of student extracurricular activities, but the district court did not separately explain this decision.[2]

Following the January hearing, the district court asked the Board to submit additional statistical data relating to several different aspects of the County schools. One of the things the Court requested was "demographic data on students participating in all extracurricular activities." (JA 479.)  The Board admitted that it has not typically maintained records tracking this type of information.  Owing to a similar request by the Tennessee Board of Education, however, the Board compiled what information it could, which turned out to be a chart showing the percentage of African-American and white students in thirty out of the County's forty-eight schools that participate in extracurricular activities. (JA 486.)  Thus, data for eighteen schools was completely omitted.  Moreover, the chart provides only the students' participation rate by race; it does not explain what the Board or individual schools deem to be extracurricular activities, or African-American and white students' participation rates within specific activities.

### 4. *Other Aspects of the District Court's Order*

The district court acknowledged that its management of the case had not been optimally tailored to helping the Board achieve unitary status.  The court said that its "failure to adopt clear and unequivocal guidelines for achievement of the [c]ourt's goals is in large part responsible for the fact that the County is seeking unitary status some forty-four years after this suit was first filed . . . ." (JA 116.) Pointing to the fact that the Plaintiffs and the County had been in "lock step" with one another for much of the last thirty years and that there had been "few, if any, contested issues, and only nominal litigation," the district court acknowledged the need for it to take a more hands-on

---

[2]The Board presented minimal evidence on this subject, which may explain the absence of the district court's explanation on its decision.

Nos. 07-6076/6363     *Robinson, et al. v. Shelby County Bd. of Educ.*     Page 35

approach to supervising the litigation with an eye to bringing it to a conclusion in the near future. The court stated that it had "largely served to 'rubber-stamp' the County's unopposed construction and zoning requests with little or no meaningful review of how such proposals contributed to or detracted from the County's overall progress toward unitary status . . . . The joint motion to dismiss compels the [c]ourt to resume a more substantive role in bringing the County school system's desegregation process to a legitimate closure." (JA 115-16.)

Besides the "flexible" benchmarks the district court set for evaluating the Board's student and faculty desegregation efforts, the district court also set timetables for achieving them. The court set October 2012 as the target date for full compliance. (JA 119.) After three years of full compliance, the court said it would dissolve the desegregation decree. (JA 119.)

Next, the district court ordered the Board to submit data annually concerning the racial composition of each school's students and teachers. The Board was further instructed to provide information about "mitigating factors, including infeasibility of further desegregation and shifting demographics, as appropriate." (JA 118.) The Board was to continue submitting notices of school construction plans and attendance-zone modifications to the court until the desegregation decree was dissolved. Contrary to the perfunctory nature of similar reports filed in the past, the court clarified that all such plans are to include a comprehensive discussion of what impact the construction and attendance-zone changes will have on the Board's desegregation efforts. (JA 119.)

Finally, pursuant to Federal Rule of Civil Procedure 53, the district court said it would appoint a special master to consider the statistical data supplied by the parties and to make annual reports and recommendations to the court. (JA 117-18.) The court instructed the parties jointly to select a special master with the requisite qualifications, which the court defined as a "neutral expert in educational research, preferably with experience in desegregation issues . . . ." (JA 118.)

## II. ANALYSIS

The record shows that the district court was both thorough and careful in considering the petition to declare the Shelby County Schools unitary. As a threshold matter, the court held two public hearings, both of which involved witness testimony, argument by counsel, and the opportunity for participation by members of the community. All parties were allowed to call and cross-examine witnesses, and the court asked questions as well. Following each hearing, the court asked the parties to provide specific additional information. Just a few days after the second hearing, the court issued its opinion which, at sixty-two pages, gave comprehensive consideration to the entire history of the case, identified and discussed the relevant Supreme Court authority, and set forth a precise plan designed to eventually eliminate the need for the desegregation decree and restore local control . The court also appended to its opinion a 116-page procedural history of the case.

Before specifically addressing each of the three areas in which the district court declined to grant unitary status, it is important to clarify what the district court's order did and did not do. Contrary to the Board's argument (repeated throughout its brief), the district court did not order the Board to comply with a "strict racial quota." True, the district court held that the Board should endeavor to achieve a ratio of white to African-American students in each school that mirrors the racial composition of the County-wide student population within fifteen percentage points, and that the Board should seek to achieve the same racial balance with respect to faculty. But the district court plainly characterized this as a "flexible goal" and "a starting point in analyzing the Board's success in desegregation." Correctly citing applicable Supreme Court precedent, the district court expressly rejected a rigid approach, saying that "racial balance is not a strict requirement and there may be mitigating circumstances which would allow a school system to operate one or more schools with a predominance of one race or another without running afoul of its equal protection obligations under the Constitution." The district court also specifically instructed the Board to submit annually information

Nos. 07-6076/6363        *Robinson, et al. v. Shelby County Bd. of Educ.*        Page 37

describing "mitigating factors" that make further progress toward racial balance infeasible.

The Board appeals the district court's order in its entirety.  Although the Government supported a declaration of unitary status below, it does not appeal the district court's rulings retaining supervisory control.  The Government says that it has "chosen not to appeal the denial of unitary status in light of the deferential clear error standard of review that applies to that determination." (Govt. Br. 29.)  With respect to the district court's modification of the decree, establishing a "flexible" student-assignment goal, the Government concedes that it is "hard pressed to argue on appeal that the district court's ruling to the contrary was clear error, or that the student assignment goals that the court put in place to remedy the remaining racial imbalance in Shelby County's schools are an abuse of discretion."  (*Id.*)  The Government, however, *is* appealing the district court's teacher-assignment goal on the ground that the court's tying of the faculty racial ratio to the student racial ratio was an abuse of discretion.

1.  *The County Has Not Carried Its Burden as to Student Desegregation*[3]

The Board argues that it has fully complied with the court's orders regarding desegregating its students.  The record evidence is simply inadequate to support this assertion.

As an initial matter, there is no indication that the Board regularly reported to the Court about the racial make-up of each of its schools relative to the County as a whole. Statistical data of this sort is largely absent from the record.  Consequently, we cannot know how the Board fared with respect to the court's original student-desegregation goal (identical racial ratios in the schools and County within a deviation of ten percentage

---

[3]In the specific setting of a school desegregation class action, "[w]here the relief sought in the district court is the dissolution of a[ ] [desegregation decree], the order of the district court is subject to a mixed standard of review." *Manning ex rel. Manning v. School Bd. Of Hillsborough County*, 244 F.3d 927, 940 (11th Cir. 2001).  The district court's application of the law is subject to de novo review, while the court's factual findings, including its determination that a school district has not achieved unitary status, fall under the clearly erroneous standard of Federal Rule of Civil Procedure 52(a). *Id.* (citations omitted); *Holton v. City of Thomasville School Dist.*, 425 F.3d 1325, 1336 (11th Cir. 2005) (citations omitted).

points). As to those years for which there is more comprehensive data, the district court found that the Board's results were unimpressive. For instance, the court found that in 1974, at least a quarter of the County's schools had not attained "the target racial composition range established by the [c]ourt in 1968 and reiterated in . . . 1971 . . . ." (JA 106-07.) The court went on to note that "[c]uriously missing from the Board's submissions was any explanation of why one school had only 2% African-American students while a handful of others had as much as 71%." (JA 107.) The district court found that by 1984, "[t]he racial balance in the schools continued to be uneven, with three schools out of 34 having fewer than 5% African-American students and three having between 50% and 72%." (JA 107-08.) Finally, the district court noted that in the 2004-05 school year, only seventeen of the County's forty-six schools "had a racial makeup that was reflective, within ten percentage points, of the 32% African-American student composition of the district as a whole." (JA 108.)

It is also difficult to evaluate the import of what little statistical data is available. It is impossible to assess whether that data reflects all the desegregation that was feasible in Shelby County, or whether that data only reflects the desegregation that the County found comfortable. This is the case because the record is virtually silent about what obstacles the Board confronted in meeting its desegregation obligations throughout the 1970s and 1980s, how it handled those obstacles, and whether it pursued all practicable forms of relief or limited itself to only the most convenient ones.

The Board relies heavily on a chart detailing statistical data about the proportion of African-American students in each of its schools during the 2002-03 and 2007-08 school years. The Board claims that this evidence shows that County schools have become more diverse over the last five years. The Board's data shows, however, that among the forty-four schools for which it has data (five schools were new), the African-American student population in 2007-08 still varied widely, from a low of three percent to a high of ninety percent. If the County-wide African-American student population was thirty-four percent in 2007, as the Board claims, then only fifteen of the forty-four schools for which the Board has demographic data would satisfy the district court's

benchmark for measuring racial balance, namely plus or minus fifteen percentage points from thirty-four percent (racially balanced schools using this metric would be those with an African-American student population of between nineteen and forty-nine percent).[4] Just ten of the County's forty-four schools would satisfy the district court's earlier goal of a school racial composition that mirrored the County's within a margin of ten percentage points.

Finally, the Board insists that any current disparities in the racial composition of its schools are caused by demographic factors unrelated to its history of segregation and over which the Board has no control, and the district court has no authority to correct. The Board also argues that annexations by the City of Memphis have affected, and will continue to affect, the African-American population within the County, making it a "moving target." (Board Br. 9.) This argument may very well have some explanatory force, but the Board did not put on sufficient evidence to substantiate it. As noted above, the witness testimony at the two hearings consisted of little more than bare assertions that the Board had done all it could, that discrimination was not tolerated, and that parents and administrators were proud of the school system's accomplishments. The Board did not present expert testimony about the shifting racial demographics within the County and how those changes affected the Board's desegregation efforts. Nor did it present expert testimony about the impact of the annexations by the City of Memphis. The Board's lack of evidentiary support on these issues stands in marked contrast to the evidence others in the Board's shoes have presented in petitions to dissolve a desegregation decree. *See, e.g., Freeman*, 503 U.S. at 471 (noting presentation of expert testimony about demographic changes in the school system since the desegregation decree was entered); *Manning*, 244 F.3d at 936 (noting presentation of "reports on attendance boundaries, demographic reports, and expert testimony" to address question of whether the racial identifiability of seventeen of the school system's 150 schools was traceable to the system's prior discriminatory behavior or to something else). Even the Government agrees that most of the evidence presented at the July hearing ( in which the

---

[4] The Government agrees. It says that "[i]n 2007, about 60% of the schools varied by more than 15% from the system-wide racial ratio, with some as high as 90% black." (Govt. Br. 37.)

Nos. 07-6076/6363        *Robinson, et al. v. Shelby County Bd. of Educ.*        Page 40

Government participated) was anecdotal. The Government notes that, "[t]he Board presented no minutes or other records documenting its decision-making and provided no demographic statistics or census maps beyond enrollment figures and charted attendance zones." (Govt. Br. at 21.)

For these reasons, I would affirm the district court's judgment denying unitary status on the issue of student desegregation.

### 2. *The County Has Not Carried Its Burden As To Faculty Desegregation*

The Board contends that the district court erred in failing to grant unitary status pertaining to faculty integration. The Government contends that the district court erred in correlating the percentage of African-American teachers in each school with the percentage of African-American students in the County overall. Importantly, neither party challenges the district court's factual findings that the County did not fully comply with the court's directives to (1) reassign faculty between schools, (2) transfer opposite-race teachers to fill vacancies, and (3) file the required notices and reports with the court. The Government even concedes that the racial imbalance among the County's teachers "create[s] a presumption against unitary status for faculty" and that "[a]ssignment of teachers according to flexible guidelines would not be an abuse of discretion." The Government's position—opposing the district court's particular remedy but not disagreeing that some type of remedy may be appropriate—implies that it does not oppose a remand for the district court to re-formulate its faculty-desegregation remedy.

As described above, the district court modified the desegregation decree to tether the racial composition of each school's faculty to the racial composition of the County's students. The Government opposes this exercise of the district court's remedial authority as an abuse of discretion, arguing that the proper comparison is the one the district court previously endorsed but has since abandoned: comparing the proportion of African-American teachers in each school to the proportion of African-American teachers County-wide.

Nos. 07-6076/6363      *Robinson, et al. v. Shelby County Bd. of Educ.*      Page 41

The Supreme Court has never ruled on whether faculty desegregation may be accomplished as the district court has suggested---through a flexible comparison of the proportion of African-American teachers in each school to the proportion of African-American students in the district as a whole. The Government relies on *Wygant v. Jackson Board of Education*, 476 U.S. 267 (1986) for the proposition that the Supreme Court would disapprove of such a comparison. In *Wygant*, white teachers with more seniority were laid off ahead of African-American teachers, some of whom were merely on probationary status. *Id.* at 272. The school board reasoned that this policy was justified in order to preserve the gains made in African-American hiring. *Id.* at 288. The district court concluded that the layoffs did not violate the Equal Protection Clause, in part, because it determined that African-American students were entitled to role models of their own race. *Id.* at 274. The Supreme Court rejected the district court's embrace of "the role model theory," concluding that "by tying the required percentage of minority teachers to the percentage of minority students, it requires just the sort of year-to-year calibration the Court stated was unnecessary in *Swann. Id.* at 276. Moreover, the Supreme Court reasoned that "[c]arried to its logical extreme, the idea that black students are better off with black teachers could lead to the very system the Court rejected in *Brown . . . ." Id.* The Court was apparently concerned that if the African-American student population shrinks over time, that fact could be used to justify hiring fewer African-American teachers. *See id.* at 276. Conversely, if the African-American student population increases over time, that would require hiring more African-American teachers, which could increase the racial identifiability of the school. *See id. Wygant*, however, is distinguishable from this case because the policy imposed resulted in layoffs, as opposed to faculty integration through transfers and reassignments.

As the Government indicates, this Court has held that a district court overseeing a desegregation decree does not have the power to set a racial quota for the hiring of African-American teachers. In *Oliver v. Kalamazoo Education Association*, 706 F.2d 757 (6th Cir. 1983), we stated that "students . . . do not have a constitutional right to attend a school with a teaching staff of any particular racial composition . . . . Rather, . . . all that the students are entitled to is the sustained good faith effort to recruit minority

Nos. 07-6076/6363        *Robinson, et al. v. Shelby County Bd. of Educ.*        Page 42

faculty members so as to remedy the effects of any past discriminatory practices." *Id.* at 762 (internal quotation marks and citation omitted). *Oliver*, however, is distinguishable from this case because a rigid racial quota had been imposed for hiring teaching staff, as opposed to a flexible goal, which is what was imposed in this case.

*Wygant* and *Oliver* are therefore not on all fours with this case. Moreover, there is no reason to fear that the district court's formulation will tend to increase the racial identifiability of schools, or require a year-to-year re-calibration, as the Government contends. The district court tied its faculty hiring goal to the African-American student population in the County as a whole, not the African-American student population in each school. Thus, a school with a student body that is fifty-five percent African-American need not aim for a faculty that is fifty-five percent African-American. Rather, using the 2007 County-wide statistic of thirty-four percent African-American students, such a school would endeavor to attain a faculty that is thirty-four percent African-American, plus or minus fifteen percentage points.

For these reasons, I would hold that the district court did not abuse its discretion in tying the percentage of African-American teachers in each school to the percentage of African-American students in the County as a whole.

3. *The Board Has Not Carried Its Burden With Respect to Extracurricular Activities*

No more need be said about this. There is no basis for reversing as clearly erroneous the district court's denial of unitary status as to extracurricular activities in light of the almost non-existent record on this subject.

### III. CONCLUSION

For the reasons articulated above, I respectfully dissent.